**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| GRANT A. LIVERETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:17-cv-811-TSE-IDD |
| | ) |
| DYNCORP INTERNATIONAL LLC, | ) |
| | ) |
| Defendant. | ) |
| ———————————————————— | ) |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant DynCorp International LLC ("DI") requests that the Court enter summary judgment in its favor as to Plaintiff Grant Liverett's Complaint and in support shows as follows.

### INTRODUCTION

DI entered into a contract with the United States government to provide security services at the Camp Bondsteel military base in Kosovo. Camp Bondsteel is in Kosovo in the heart of the Balkan Peninsula, a war-torn area where tight security is an absolute necessity. Liverett worked as an Armed Guard Post Supervisor for DI at Camp Bondsteel. He was responsible for inspecting vehicles and searching visitors at the gate to Camp Bondsteel for alcohol and other contraband. Like all other security personnel at Camp Bondsteel, he was trained to follow security protocol to the letter without exception. On September 23, 2014, during one of his shifts, Liverett discovered that visitors to Camp Bondsteel were attempting to introduce alcohol on base, which is strictly prohibited by the U.S. Army and DI. Instead of immediately notifying the Force Protection Officer Center (FPOC) supervisor of the alcohol, as procedure required, he took the alcohol and held it for

1

safekeeping in the guard shack, planning to provide it to military personnel to bring on base if they came back to retrieve it.  DI reported those facts to the U.S. Army, as required, who determined that Liverett violated security protocol on how to handle and report alcohol—namely, General Order #1 and Battle Drill #17—and thereafter the U.S. Army barred Liverett from working at all government military bases.  The U.S. Army then placed Liverett on its bar access list to keep track of him and other security contractors who were prohibited from entering government military bases due to their violations of government policies.

Rather than seek redress from the U.S. Army, Liverett has sued DI for defamation and tortious interference with business relationship.  Specifically, Liverett claims that DI falsely reported to the U.S. Army that he violated General Order #1 and Battle Drill #17, which resulted in him being barred from all government military bases and interfered with his employment agreement with another security contractor, Torres Advanced Enterprise Solutions, LLC ("Torres").

As a threshold matter, Liverett cannot meet his burden of showing that a genuine issue of material fact exists with respect to his defamation and tortious interference claims.  On October 26, 2017, the Court sanctioned Liverett for failing to appear at his properly noticed October 12, 2017 deposition by ruling that he could not (a) offer into evidence at summary judgment any documents or witness testimony not previously and adequately identified in written discovery responses or disclosures or (b) submit a personal affidavit or declaration at summary judgment. The former sanction prevents Liverett from opposing DI's summary-judgment motion by offering documents or witness testimony disclosed after the Court's October 26, 2017 Order.  The latter sanction prevents Liverett from opposing DI's summary-judgment motion by submitting personal

testimony in the form of an affidavit or declaration.  Those sanctions effectively prohibit Liverett from producing sufficient evidence to create a genuine issue of material fact on whether DI defamed him and tortiously interfered with his employment.

Even if the discovery sanctions were not in effect, the undisputed material facts in this case make clear that his defamation and tortious interference claims are meritless.

With respect to his defamation claim, Liverett alleges that DI defamed him by reporting to the U.S. Army that he violated General Order #1 and Battle Drill #17.  DI did not tell the U.S. Army that Liverett violated those policies but rather simply informed the U.S. Army about what happened factually on September 23, 2014.  DI's report about what happened cannot serve as the basis for Liverett's defamation claim because DI is a government contractor and is contractually required to make such reports and any reports made to the government pursuant to a governmentally-imposed duty are immune from liability. This privilege is not qualified but *absolute* and applies regardless of whether the report was correct.  Accordingly, the government contractor-to-government absolute privilege defense precludes Liverett's defamation claim and thus DI is entitled to summary judgment on that claim.

Even if this absolute privilege did not apply, Liverett cannot as a matter of law establish the elements of defamation: (1) publication (2) of an actionable statement (3) with the requisite intent.

As to the first element, DI did not notify the U.S. Army that Liverett violated General Order #1 and Battle Drill #17.  Instead, it simply informed the government that Liverett took alcohol from visitors; planned to give the alcohol to military personnel; held the alcohol for safekeeping; and failed to notify the FPOC supervisor of the alcohol.  Based on those facts, the U.S. Army—

and **<u>not DI</u>**—decided that Liverett violated General Order #1 and Camp Bondsteel Battle Drill #17. Under U.S. Army policy, a violation of those policies automatically results in the individual being barred from entering any government military base. The U.S. Army creates bar access lists on U.S. Army letterhead to keep track of individuals who are barred from entering government military bases. The U.S. Army included Liverett on its bar access list because the U.S. Army—and **<u>not DI</u>**—concluded that he violated General Order #1 and Battle Drill #17. Accordingly, it was the U.S. Army—and **<u>not DI</u>**—who "published" that Liverett violated General Order #1 and Battle Drill #17 and who "published" the bar access list.

As to the second element, the statements are not actionable as defamation because they are indisputably true: the U.S. Army concluded that Liverett violated General Order #1 and Battle Drill #17 and it placed him on its bar access list. General Order #1 is a U.S. Army policy that prohibits the possession, introduction, and transfer of alcohol on U.S. military bases. It also states that alcohol will not be provided to *any* military person. Battle Drill #17 is a related U.S. Army policy that is specific to Camp Bondsteel. It requires civilian contractors to notify the FPOC supervisor if any visitor attempts to enter Camp Bondsteel with alcohol. It also prohibits civilian defense contractors from holding alcohol for safekeeping. Liverett admits that he (i) took alcohol from visitors to the base; (ii) planned to provide the alcohol to military personnel if they came back to retrieve it; (iii) held the alcohol for safekeeping; and (iv) failed to notify the FPOC supervisor of the alcohol. Those facts are all undisputed and all violate U.S. Army policy. DI reported them to the U.S. Army who in turn concluded that Liverett breached General Order #1 and Battle Drill #17 and therefore should be placed on the U.S. Army bar access list. As such, none of the statements at issue are actionable as defamation because they are undeniably true.

4

As to the third element, and even assuming it was DI (and not the government) who determined that Liverett violated General Order #1 and Battle Drill #17, DI did not act with the intent required for a defamation claim: it neither knew the statement was false nor negligently failed to ascertain whether it was false.  Incident reports from Liverett and two others indicated that Liverett took alcohol, planned to give the alcohol to military personnel, held the alcohol for safekeeping, and failed to notify the FPOC supervisor of the alcohol.  All of those acts are admitted by Liverett and constituted clear violations of General Order #1 and Battle Drill #17.  Therefore, they are not false statements and cannot possible show the requisite intent.  For these reasons too, DI is entitled to summary judgment on Liverett's defamation claim.

Turning to Liverett's tortious interference claim, he cannot as a matter of law demonstrate that DI intentionally interfered with his employment contract with Torres because DI *did not* tell Torres that Liverett violated security protocol or was on the U.S. Army's bar access list.  In fact, Torres never received any communications from DI about Liverett—only communications from the U.S. Army stating that Liverett was barred from working at Camp Bondsteel due to his violations of security protocol.  Moreover, Liverett stated in his lawsuit against Torres that he informed Torres before he was hired and during his employment "that he was allegedly barred from being on base in Camp Bondsteel."  If Torres already knew about Liverett being barred and hired him anyway, there is no causal connection between any information DI provided to the U.S. Army that resulted in Liverett being barred and any employment decision made by Torres.  Indeed, Torres testified that it did not receive or consider any communication from DI in deciding to terminate Liverett's employment agreement.

In any event, even if Liverett could prove the intent element of his tortious interference claim, DI's actions were justified or privileged for the same reasons as his defamation claim: DI contracted with the U.S. Army to provide security services at Camp Bondsteel and thus it had an affirmative contractual duty to report the facts of the September 23, 2014 incident to the U.S. Army. DI cannot be held liable under business tort law for a report made to the U.S. Army concerning potential breaches of security protocol.  To penalize DI for doing so would disrupt essential communications between the U.S. Army and its defense contractors regarding security at a military base—a position the Fourth Circuit has decidedly rejected.  Accordingly, the Court should grant summary judgment in DI's favor as to Liverett's tortious interference claim.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**Liverett Begins Working for DI Pursuant to Foreign Service Employment Agreement**

1.     On December 4, 2012, Liverett signed a Foreign Service Employment Agreement (FSEA) with DI for the position of Armed Guard (AG) at Camp Bondsteel, a U.S. Army base in Kosovo.  The FSEA was for the period November 30, 2012 to November 29, 2013.  On November 26, 2013, Liverett signed a second FSEA with DI for the position of AG Post Supervisor at Camp Bondsteel in Kosovo.  The FSEA was for the period November 30, 2013 to November 29, 2014. *See* 2012-2013 FSEA (Liverett Dep. Exhibit 3) (attached hereto as Exhibit A); 2013-2014 FSEA (Liverett Dep. Exhibit 4) (attached hereto as Exhibit B); Declaration of Wade Childs (attached hereto as Exhibit C) ¶¶ 3-4.

2.     As an AG Post Supervisor, Liverett was responsible for searching vehicles and visitors entering Camp Bondsteel for alcohol, explosives, weapons, and other contraband and preventing those items from being introduced on the camp.  He was also responsible for notifying

security personnel of attempted introductions of contraband onto Camp Bondsteel.  As an AG Post Supervisor, Liverett had full working knowledge of and was trained on U.S. Army general orders and Camp Bondsteel battle drills.  Liverett reported to Wade Childs, DI's Project Manager at Camp Bondsteel.  *See* Childs Decl. ¶ 5; Liverett Dep. (relevant portions attached hereto as Exhibit D) at 45:12-20, 47:11-48:4, 49:17-22, 53:10-54:5, 73:20-74:12, 134:13-135:1.

**General Order #1 and Battle Drill #17**

3.      General Order #1 is a U.S. Army policy that prohibits the possession, introduction, and transfer of alcohol on military bases.  It also states that "[a]lcohol will not be provided to any military person or DoD civilian."  *See* DI Use of Alcohol Policy (Liverett Dep. Exhibit 8) (attached hereto as Exhibit E); Childs Decl. ¶ 6; Liverett Dep. at 96:11-98:9.

4.      Both FSEAs Liverett signed stated the following with respect to General Order #1: "Employees are prohibited from consuming, using or possessing alcohol while in Kosovo and employed under the contract of Armed and Unarmed Guard Services-Camp Bondsteel.  Failure to adhere to this prohibition at any time during the term of this contract and under any circumstances will subject the Employee to disciplinary action up to and including termination of employment."  *See* Exhibits A & B; Childs Decl. ¶ 7; Liverett Dep. at 41:2-18, 44:1-11, 90:14-16, 96:11-98:9.

5.      General Order #1 is contained in other DI documents provided to Liverett.  *See* Certificate of Completion (stating that he completed a course on "general orders") (Liverett Dep. Exhibit 10) (attached hereto as Exhibit F); Standards and Conditions of Employment (acknowledging that he understood that misconduct including "possessing …. alcoholic beverages") (Liverett Dep. Exhibit 13) (attached hereto as Exhibit G); August 12, 2014 Guard Mount Training (indicating that Liverett was trained on the "USE OF ALCOHOL POLICY")

(attached hereto as Exhibit H); *see also* Childs Decl. ¶ 8. Liverett Dep. at 134:7-135:1 (testifying that he was trained on General Order #1).

6.      Liverett volunteered to give a PowerPoint presentation on General Order #1 to other DI personnel at Camp Bondsteel in May 2014.  One slide on his PowerPoint stated in all caps: "ALCOHOL WILL NOT BE INTRODUCED ONTO ANY MILLTARY INSTALLATION." Another slide stated also in all caps: "ALCOHOL WILL NOT BE PROVIDED TO ANY MILITARY PERSON." *See* PowerPoint Presentation (Liverett Dep. Exhibit 9) (attached hereto as Exhibit I); Emails Related to PowerPoint Presentation (attached hereto as Exhibit J); Childs Decl. ¶ 9.

7.      Battle Drill #17 is a related U.S. Army policy specific to Camp Bondsteel.  It applies when "[p]erson(s) attempt to enter Camp Bondsteel with unauthorized items such as … alcohol." It requires contract guard force personnel to notify the FPOC supervisor "of all prohibited items found at the gate."  It states that "[n]o items will be held for safekeeping by any contract guard personnel."  It lists "[a]ll items prohibited under General Order #1" as "[e]xamples of unauthorized items."  *See* Battle Drill #17 (Liverett Dep. Exhibit 6) (attached hereto as Exhibit K); Childs Decl. ¶ 10.

8.      Less than three weeks before the September 23, 2014 incident and during one of Liverett's shifts, he received training on Battle Drill #17.  *See* September 5, 2014 Guard Mount Topic (Liverett Dep. Exhibit 5) (attached hereto as Exhibit L); Childs Decl. ¶ 11; Liverett Dep. at 49:1-22, 52:8-18, 53:10-54:20.

**The U.S. Army Concludes that Liverett Violated General Order #1 and Battle Drill #17 and Was Therefore Barred from All U.S. Military Bases**

9.      On September 23, 2014, a group of U.S. Army and Serbian Army personnel arrived at Gate 1 where Liverett was working for DI as an AG Post Supervisor.  Liverett learned that this group was trying to introduce alcohol onto Camp Bondsteel.  Rather than immediately notify the FPOC supervisor as he was required and trained to do, Liverett told the group that he would hold the alcohol for safekeeping and permit it onto Camp Bondsteel if the base commander asked for it prior to the end of his shift.  He then placed the alcohol underneath the desk at the Gate 1 supervisor shack.  At the end of his shift, he poured the alcohol from the bottle and threw it away.  *See* Childs Decl. ¶ 12; Compl. ¶ 13 ("[Liverett] then advised that he would hold the bottle and permit it into the installation…."); Liverett Dep. at 101:17-22 (stating that a contingent of U.S. Army and Serbian Army arrived at Gate 1), 106:6-7 ("Q And who put it inside? A I did."), 148:14-16 ("Q The FPOC, you didn't call the FPOC or whatever it is? A No.").

10.      After learning of the incident, Childs reported to the U.S. Army factually what occurred at Camp Bondsteel Gate 1 on September 23, 2014 based on written incident reports from Liverett and two other DI personnel.  Those reports indicated that Liverett took alcohol from a visitor to the base and "continued to hold it"; planned to provide the alcohol to military personnel to bring onto base if they came "back to retrieve it"; failed to notify the FPOC supervisor of the visitor's attempt to enter Camp Bondsteel with alcohol; and "held [the alcohol] at the Gate 1 Supervisor shack" for safekeeping even though it was "against [DI] policy to hold alcohol for anyone at the gate."  *See* Childs Decl. ¶ 13; Incident Reports (attached hereto as Exhibit M).

11.    DI was required to report the facts related to the September 23, 2014 incident to the U.S. Army pursuant to the contract between the U.S. Army and DI.  That contract states that all DI personnel shall comply with General Order #1 while deployed in Kosovo and that DI must report any incidents in which General Order #1 could have been violated.  It is ultimately, however, the U.S. Army's determination as to whether a civilian contractor violated General Order #1.  *See* Childs Decl. ¶ 14; Relevant Portion of Contract between the U.S. Army and DI (attached hereto as Exhibit N).

12.    Specifically, Childs told the U.S. Army that Liverett (i) took alcohol from visitors to the base; (ii) planned to provide the alcohol to military personnel to bring onto base if they came back to retrieve it; (iii) held the alcohol for safekeeping; and (iv) failed to notify the FPOC supervisor of the visitors' attempt to enter Camp Bondsteel with alcohol.  Childs did not tell the U.S. Army that Liverett consumed alcohol.  *See* Childs Decl. ¶ 15.

13.    Based on these facts, the U.S. Army determined that Liverett violated General Order #1 and Battle Drill #17.  The U.S. Army did not base its determination on Liverett consuming alcohol because Childs did not report that.  *See* Childs Decl. ¶ 16.

14.    Under U.S. Army policy, a violation of General Order #1 and Battle Drill #17 automatically results in the individual being barred from entering any U.S. military base.  The U.S. Army creates "bar access lists" to keep track of individuals who are barred from entering U.S. military bases.  The U.S. Army Camp Bondsteel Area Support Team ("AST") created a bar access list for Camp Bondsteel using U.S. Army AST letterhead.  The U.S. Army AST included Liverett on the bar access list because the U.S. Army determined that he violated General Order #1 and Camp Bondsteel Battle Drill #17.  *See* Childs Decl. ¶ 17; U.S. Army AST Bar Access List (attached

hereto as Exhibit O); Liverett Dep. at 202:1-203:21 (stating that Della Hodges, Director of AST Balkans for the U.S. Army, "made the decision to put [him] on the bar list").

15.     Liverett admitted during his deposition that he had no personal, first-hand knowledge of what DI may have said to the U.S. Army regarding his General Order # 1 and Battle Drill #17 violations, when DI may have said anything to the U.S. Army, or when exactly the U.S. Army decided to bar him from all of its military bases.  *See* Liverett Dep. at 174:4-22, 186:5-12, 204:4-22, 237:3-9; 245:9-246:12, 247:16-22, 248:9-15.

**Liverett Resigns from DI on September 24, 2017**

16.     The very next day after the alcohol incident, September 24, 2014, Liverett resigned his position as AG Post Supervisor with DI.  *See* Resignation Letter (Liverett Dep. Exhibit 14) (attached hereto as Exhibit P); Childs Decl. ¶ 18.

17.     DI accepted Liverett's resignation and directed him to depart Camp Bondsteel. Liverett eventually departed Camp Bondsteel on October 3, 2014. *See* Acceptance of Resignation Letter (Liverett Dep. Exhibit 15) (attached hereto as Exhibit Q); Childs Decl. ¶ 19.

**Liverett Begins Working for Torres at Camp Bondsteel**

18.     Liverett applied for a contractor position with Torres in fall 2014.  Torres accepted his application and entered into a subcontracting agreement with him on October 10, 2014.  Under the terms of this contract, Liverett agreed to provide services as "a subject matter expert and proposal consultant" and to assist Torres in its attempts to obtain the Camp Bondsteel guard services contract.  *See* Declaration of Daniel Cotter (attached hereto as Exhibit R) ¶¶ 3 & 5; 2014 Subcontracting Agreement (attached hereto as Exhibit S); Liverett Dep. at 217:5-14, 219:7-221:21, 223:5-8.

19.     On or about June 17, 2015, Torres won a contract for guard services at Camp Bondsteel. After winning the Camp Bondsteel contract, Torres entered into a second subcontracting agreement with Liverett on June 22, 2015.  This contract specified that Liverett would provide services as "Project Manager for the Camp Bondsteel Guard Services Program" and that the work to be performed "will be at Camp Bondsteel Kosovo.  This is a United States Army installation."  Further, the contract specified that all "[s]ervices must be preapproved by the Senior Program Manager or Torres Senior Management." *See* Cotter Decl. ¶¶ 6-7; 2015 Subcontracting Agreement (attached hereto as Exhibit T); Liverett Dep. at 226:5-227:17.

**Torres Terminates Liverett's Employment Because the U.S. Army Told Torres that Liverett Was Barred from All U.S. Military Bases**

20.     On June 25, 2015, the U.S. Army emailed Torres to notify it that Liverett was not permitted on Camp Bondsteel.  The email stated the following: "Mr Liverett is not allowed to work, live or visit Camp Bondsteel.  While working under the incumbent contract in 2014, Mr. Liverett was charged of violating G.O.#1 for use/possession of alcohol.  He has been denied entry to the camp as [a] result of this violation."  *See* Cotter Decl. ¶ 10 and Exhibit A.

21.     In or about November 2015, Torres informed Liverett that they could not employ him due to the U.S. Army's order preventing him from accessing Camp Bondsteel.  Liverett left Kosovo on December 11, 2015 and did not provide any services to Torres after that date.  *See* Cotter Decl. ¶¶ 11-12.

22.     Torres had no contact with DI concerning Liverett's employment with Torres or the bar from his entry to Camp Bondsteel.  Torres did not have or consider any communication

from DI in terminating Liverett's 2015 Subcontracting Agreement.  Liverett was unable to perform that contract due to his inability to access Camp Bondsteel.  Cotter Decl. ¶ 13.

**Liverett Admitted in His Lawsuit against Torres That He Informed Torres That He Was Barred from Camp Bondsteel**

23.    In March 2016, Liverett filed a complaint against Torres in this Court, which he amended in May 2016.  Liverett's amended complaint asserted a FLSA minimum wage and overtime claim, tax claim under 26 U.S.C. § 7434, and breach of contract claim.  In a footnote on page three of his amended complaint, Liverett stated that he disclosed to at least seven Torres employees (including CEO Jerry Torres) on multiple occasions "that he was allegedly barred from being on base in Camp Bondsteel."  Liverett made this disclosure "both before [Torres] hired [him] in 2014 and throughout his employment with [Torres]."  *See Liverett v. Torres Advanced Enterprise Solutions LLC*, No. 1:16-cv-00339 (TSE) (E.D. Va. 2016) (ECF No. 14) (attached hereto as Exhibit U) at 3 n.1.

## STANDARD

A court should grant summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  It is not the moving party's obligation to support its motion with declarations and other materials negating the opponent's claim. *Id.*  Rather, once the moving party has demonstrated the absence of a genuine issue of material fact, the burden shifts to the non-moving party to present facts showing that a genuine issue remains for trial.  *Id.* at 323-24.

A non-moving party cannot defeat a summary-judgment motion merely by presenting some evidence in support of its case or by relying on conclusory or speculative allegations, denials, vague statements, or suspicions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Instead, the non-moving party must present affirmative evidence to establish that a jury could reasonably find in his favor. *Id.*

Trial judges have an "affirmative obligation" to ensure factually unsupported claims and defenses do not proceed to trial. *Bouchat v. Baltimore Ravens Football Club*, 346 F.3d 514, 526 (4th Cir. 2003).

## ARGUMENT AND AUTHORITIES

**A.    The Court's Sanctions Effectively Preclude Liverett from Submitting Sufficient Evidence to Create a Genuine Issue of Material Fact on His Defamation and Tortious Interference Claims.**

Because Liverett failed to show up for his duly noticed deposition on October 12, 2017, the Court sanctioned him by prohibiting him from "offering … in support of or opposition to summary judgment any documents or witness testimony not previously and adequately identified in written discovery responses or disclosures" and from "submitting any personal affidavit or declaration in support of or opposition to summary judgment." *See* October 26, 2017 Order (ECF No. 48).  The first sanction precludes Liverett from opposing DI's summary-judgment motion by offering documents or witness testimony disclosed after the Court's October 26, 2017 Order.  The second sanction prevents Liverett from opposing DI's summary-judgment motion by submitting personal testimony in the form an affidavit or declaration.  The two sanctions effectively prohibit him from presenting sufficient evidence to show that there is a genuine issue of material as to his defamation and tortious interference claims.  As such, he cannot oppose DI's summary-judgment motion and the Court should grant it.  *See Celotex*, 477 U.S. at 323-24 (holding that non-moving party must present facts showing that a genuine issue remains for trial); *Anderson*, 477 U.S. at 249

(holding that non-moving party must present affirmative evidence to establish that a jury could reasonably find in his favor).

Even if the Court had not issued sanctions and permitted Liverett to submit any evidence he pleased, his defamation and tortious interference claims fail on the merits.

**B.      Liverett's Defamation Claim Fails on the Merits.**

   **1.      DI's report to the U.S. Army Was Absolutely Privileged.**

Contrary to Liverett's assertions, DI *did not* notify the U.S. Army that Liverett violated General Order #1 and Battle Drill #17.  Rather, it apprised the U.S. Army of the facts related to the September 23, 2014 incident—facts which Liverett admits to be true.  SOUMF ¶ 10.  DI's report to the U.S. Army is absolutely privileged because a government contractor cannot be held liable for defamation of one of its employees because of a report made about that employee pursuant to a governmentally-imposed duty.  *See Becker v. Philco Corp.*, 372 F.2d 771, 776 (4th Cir. 1967) (concluding that a defamation action "will not lie" against a private defense contractor "fulfilling its governmentally imposed duty to inform"); *Mangold v. Analytic Servs.*, 77 F.3d 1442, 1459-50 (4th Cir. 1996) (holding that government contractors are absolutely immune from defamation claims based on information given in response to government inquiries); *Twigg v. Triple Canopy*, No. 1:10CV122 (JCC), 2010 WL 2245511, at *7 (E.D. Va. June 2, 2010) (dismissing defamation claim against government security services contractor who responded to government inquiry about employee's job termination by noting employee's violations of alcohol policy); *Scharpenberg v. Carrington*, 686 F.Supp.2d 655, 659-60 (E.D. Va. 2010) (holding

contractor had absolute immunity from liability for statements made in response to government inquiry).[1]

Here, DI had a contractual duty to report the facts related to the September 23, 2014 incident to the U.S. Army.  SOUMF ¶ 11.  Stated differently, a government contractor (DI) advised the government (U.S. Army) about the conduct of one of its employees (Liverett) pursuant to the contract between the government contractor and government (DI-U.S. Army contract).  Thus, the government contractor-to-government absolute privilege defense fits squarely into this case and bars Liverett's defamation claim.  *See Becker*, 372 F.2d at 776; *Mangold*, 77 F.3d at 1459-50; *Twigg*, 2010 WL 2245511, at *7; *Scharpenberg*, 686 F. Supp. 2d at 659-60; *Sember*, 2017 WL 3314652, at *4.  This absolute privilege would apply—and bar Liverett's defamation claim—even if DI had reported to the U.S. Army that Liverett violated General Order #1 and Battle Drill #17, which it did not.  It would also apply even if the report was false, which it was not.  *See Becker*,

---

[1] *See also Gulati v. Zuckerman*, 723 F. Supp. 353, 358 (E.D. Pa. 1989) ("A grant of immunity is clearly justified in this case.  The maintenance of the necessary level of security throughout our vast defense industry requires a high level of cooperation by defense contractors.  Contractors have the duty to report all manner of potentially damaging information about their employees to the appropriate federal authorities.  They must be able to do this free of the fear of expensive litigation.  Self-censorship in adverse information reporting would be extremely detrimental to the federal goal of ferreting out security risks in the defense industry.  It is the province of federal security investigators, not of reporting contractors, to sort out valid reports of employee misbehavior from unfounded fictions."); *Sember v. Booz Allen Hamilton Eng'g Servs., LLC*, Case No. 3:16-cv-445, 2017 WL 3314652, at *4 (S.D. Ohio Aug. 3, 2017) ("The policy reasons for the immunity granted federal contractors in cases involving defamation claims therefore also apply here.  Namely, permitting Sember's claim to go forward could engender self-censorship among federal contractors due to a fear of expensive litigation that would be extremely detrimental to the federal goal of ferreting out security risks in the defense industry."); *Montgomery v. Sanders*, No. 3:07-CV-470, 2008 WL 4546262, at *4 (S.D. Ohio Aug. 18, 2008) ("This absolute immunity allows defense contractors to alert the United States to potential threats to national security without fear of a lawsuit, which would otherwise encourage self-censorship.").

372 F.2d at 776 ("There is no question but that the system of reporting was valid.  The obligation could scarcely be couched in more imperious or exacting language.  It embraces both true and false accusations, both substantial and insubstantial suggestions, perhaps encompassing even remors [sic].") and at 775–76 ("[W]e do not decide that the plaintiffs were rightly suspended…. Our decision only determines that an action for libel will not lie in the circumstances against a private party fulfilling its governmentally imposed duty to inform."); *Mission1st Grp., Inc. v. Filak*, No. CIV.A. 09-3758 JAP, 2010 WL 4974549, at *2 (D.N.J. Dec. 2, 2010) ("This privilege is absolute and holds regardless of whether the information was rightly reported.").

Accordingly, DI is entitled to summary judgment on Liverett's defamation claim because any statements made by DI to the U.S. were absolutely privileged.

### 2.     Liverett cannot establish any of the three elements of defamation.

Even if the absolute privilege defense does not apply, Liverett cannot establish any of the three elements of a defamation claim in Virginia: (1) publication (2) of an actionable statement (3) with the requisite intent.  *Jordan v. Kollman*, 269 Va. 569, 575 (Va. 2005).

### a.     DI did not "publish" the statements.

The publication element of a defamation claim requires the plaintiff to show that *the defendant* published the defamatory statement. *Dragulescu v. Virginia Union Univ.*, 223 F.Supp.3d 499, 507 (E.D. Va. 2016).

Here, DI did not advise the U.S. Army that Liverett violated General Order #1 and Battle Drill #17.  Rather, it merely informed the government that Liverett took alcohol from visitors; planned to give the alcohol to military personnel; held the alcohol for safekeeping in the supervisor's shack; and failed to notify the FPOC supervisor of the alcohol.  SOUMF ¶ 12.  Based

on those facts, the U.S. Army—and **not DI**—determined that Liverett violated General Order #1 and Battle Drill #17. *Id.* ¶ 13. Pursuant to U.S. Army policy, a violation of those policies automatically leads to the individual being barred from entering any military installation. *Id.* ¶ 14. The U.S. Army AST created a bar access list on its letterhead to track individuals who were barred from entering Camp Bondsteel. *Id.* The U.S. Army listed Liverett on its bar access list because the U.S. Army—and **not DI**—found that he violated General Order #1 and Battle Drill #17. *Id.* Accordingly, it was the government—and **not DI**—who "published" that Liverett violated General Order #1 and Battle Drill #17 and who "published" the bar access list.

As such, Liverett cannot satisfy the first element of his defamation claim. *Dragulescu*, 223 F.Supp.3d at 507 (E.D. Va. 2016).

> **b.     The statements are not "actionable" because they are indisputably true.**

It is axiomatic that a statement must be false to be actionable as defamation. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993).

General Order #1 is a U.S. Army policy that forbids the possession, introduction, and transfer of alcohol on military installations. SOUMF ¶ 3. It also states that "[a]lcohol will not be provided to any military person or DoD civilian." *Id.* Camp Bondsteel Battle Drill #17 is a related U.S. Army policy that applies when a person attempts to enter Camp Bondsteel with alcohol. *Id.* ¶ 7. These policies require contract guard force personnel, such as Liverett, to notify the FPOC supervisor of all prohibited items found at the gate. *Id.* These policies also provide that prohibited items cannot be held for safekeeping at the gate by any contract guard force personnel. *Id.* It lists as examples unauthorized items "[a]ll items prohibited under General Order #1." *Id.*

18

Liverett cannot and does not dispute that he (i) took alcohol from visitors to the base; (ii) made arrangements to provide the alcohol to military personnel if they came back to retrieve it; (iii) held the alcohol for safekeeping; and (iv) failed to notify the FPOC supervisor of the attempt by the group of visitors to enter Camp Bondsteel with alcohol.  *Id.* ¶ 12.  As indicated by the written incident reports from Liverett and two of his colleagues, all of these statements are undeniably true and therefore undisputed.  *Id.* ¶ 10.  DI reported these facts to the U.S. Army who then determined that Liverett breached General Order #1 and Battle Drill #17 and, accordingly, must be included on its bar access list.  *Id.* ¶¶ 10, 12-14.[2]

Since all of the statements that Liverett complains of in this case are *not* false, they are not actionable as defamation.  *Chapin*, 993 F.2d at 1092 (4th Cir. 1993).  Accordingly, Liverett cannot satisfy the second element of his defamation claim.

### c.    Even assuming DI made the statements, DI did not act with the "requisite intent."

To establish "requisite intent" in defamation cases where the plaintiff is a private individual, "the defendant may be found liable if the defendant knew the statement to be false or negligently failed to ascertain whether the statement was false."  *Taylor v. CNA Corp.*, 782 F.Supp.2d 182, 201 (E.D. Va. 2010).

---

[2] Liverett's assertion in his Complaint that DI published false statements that he violated General Order # 1 by consuming alcohol is not supported by the record evidence and is patently false. Childs did not report that Liverett consumed alcohol to the U.S. Army or to Torres.  SOUMF ¶¶ 10, 12, 22.  The U.S. Army—who makes determinations about violations of General Order # 1— did not base its determination that Liverett violated General Order #1 and Battle Drill #17 on him consuming alcohol because Childs did not report that.  *Id.* ¶ 12.  Additionally, Liverett admitted during his deposition that he had no first-hand knowledge of what DI may have said to the U.S. Army regarding his General Order # 1 and Battle Drill #17 violations.  *Id.* ¶ 15.

DI did not know or have reason to believe that any of its statements were false. Written incident reports from Liverett and two other DI personnel indicated that Liverett took alcohol from visitors to the bases and "continued to hold it"; planned to provide the alcohol to military personnel to bring onto base if they came "back to retrieve it"; "held [the alcohol] at the Gate 1 Supervisor shack" for safekeeping even though it was "against [DI] policy to hold alcohol for anyone at the gate"; and failed to notify the FPOC supervisor of the visitors' attempt to enter Camp Bondsteel with alcohol. SOUMF ¶ 10. Liverett cannot offer any evidence contradicting DI's good-faith belief that those undisputed statements were true at the time they were made and communicated to the U.S. Army. Even if DI went further and did state that Liverett violated General Order #1 and Camp Bondsteel Battle Drill #17, a determination reserved for the U.S. Army, there is no basis to find that DI did not believe such statements to be true given the facts admitted by Liverett and reported by others.

Accordingly, Liverett cannot satisfy the third element of his defamation claim. *See Taylor*, 782 F.Supp.2d at 201.

## C.   Liverett's Tortious Interference Claim Fails on the Merits.

### 1.   Liverett cannot establish all of the elements of tortious interference.

Liverett also claims that DI intentionally interfered with his employment contract with Torres. The elements for intentional interference with performance of a contract by a third party are: (1) the existence of a valid contractual relationship; (2) knowledge of the relationship on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship; and (4) resultant damage to the party whose relationship has been disrupted. *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 216 (Va. 2014).

20

Liverett cannot establish the third element of his tortious interference claim because he cannot show that DI told Torres that he violated General Order #1 or Camp Bondsteel #17 or that DI told Torres that he was on the U.S. Army's bar access list.  Rather, the undisputed evidence shows that Torres only communicated with the U.S. Army who told Torres that Liverett was barred from Camp Bondsteel due to his General Order #1 and Camp Bondsteel Battle Drill #17 violations.  SOUMF ¶¶ 20, 22.  To the extent any communication about his status induced or caused Torres to terminate Liverett's employment, which has not been established, that communication came from the U.S. Army and **not DI**.  *Id.*  Stated differently, Liverett cannot show that DI intended to interfere with his Torres employment because DI did not communicate with Torres—only the U.S. Army did.  *Id.*

Indeed, Liverett admitted in his breach of employment contract lawsuit against Torres that he told at least seven Torres employees (including CEO Jerry Torres) on multiple occasions "that he was allegedly barred from being on base from Camp Bondsteel."[3]  *Id.* ¶ 23.  If Torres already

---

[3] Daniel Cotter (Torres CFO) asserts in his declaration that Liverett did not inform Torres that the U.S. Army banned him from Camp Bondsteel during the negotiations of either the 2014 or 2015 Subcontracting Agreements.  *See* Cotter Decl. ¶ 8.  Torres made that same assertion in its motion to dismiss Liverett's complaint against it.  *See Liverett v. Torres Advanced Enterprise Solutions LLC*, No. 1:16-cv-00339 (TSE) (E.D. Va. 2016) (ECF No. 10).  But in his Amended Complaint in that case Liverett stated that Torres was "flat out being untruthful" in its motion to dismiss and vigorously stated he "disclose[d] that he was allegedly barred from being on base in Camp Bondsteel" to at least seven Torres employees, including Jerry Torres (Torres CEO).  *See* SOUMF ¶ 23. Liverett is bound by the statement in his Amended Complaint as a party admission and statement against interest.  In any event, regardless of whether Torres or Liverett is the honest party, there is not *any* evidence that DI tortiously interfered with the employment contract between Torres and Liverett.  Indeed, as Cotter declares, Torres "had no contact" with DI concerning Liverett's employment with Torres "or the bar from his entry to Camp Bondsteel."  Cotter Decl. ¶ 13.  Nor did Torres "have or consider any communication from [DI] in terminating the 2015 Contract."  *Id.*

knew that Liverett was barred from Camp Bondsteel and it hired him anyway and allowed him to work for over a year, there is no causation between anything DI could have said to the U.S. Army and any employment decision made by Torres because Torres already had such knowledge from Liverett himself and, thus, it would not have relied upon any assertion made by DI in making its decision to end its employment relationship with Liverett.

Moreover, Liverett has admitted that he had no first-hand knowledge of what DI may have said to the U.S. Army regarding his General Order # 1 and Battle Drill #17 violations, when DI may have said anything to the U.S. Army, or when exactly the U.S. Army decided to bar Liverett from all of its military bases. *Id.* ¶ 15. Without evidence of what DI may have said, when it was said, and to whom, Liverett cannot establish intentional interference, the third element of his tortious interference claim.

Accordingly, the Court should grant summary judgment in DI's favor as to this claim. *See Dunlap*, 287 Va. at 216.

2. **Even if Liverett could establish all of the elements of tortious interference, DI's conduct was justified and privileged.**

Even if Liverett could prove all elements of tortious interference, which he cannot, DI's conduct was justified and privileged. The Virginia Supreme Court has stated that an affirmative defense to a tortious interference claim is "justification or privilege." *Chaves v. Johnson*, 230 Va. 112, 121 (Va. 1985). "It is similar, but not identical, to the defense of qualified privilege in the law of defamation." *Id.* "It is based upon the relationships between the parties and the balance to be struck between the social desirability of protecting the business relationship, on one hand, and the interferor's freedom of action on the other." *Id.*

22

Here, DI's actions were justified and privileged.  DI contracted with the government to provide security services at Camp Bondsteel and had an affirmative duty to report the facts of the September 23, 2014 incident.  SOUMF ¶ 11.  DI cannot face liability for a business tort claim because it made those true statements concerning possible violations of security protocol to the U.S. Army, pursuant to the requirements under its security services contract with the U.S. Army.  To hold otherwise would punish DI for making necessary communications to the U.S. Army regarding potential violations of General Order #1 and Battle Drill #17.  *See Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 322 (4th Cir. 2012) (affirming dismissal of tortious-interference claim and holding that, "For us to expand liability for tortious interference … to encompass [a government contractor's] conduct would work inestimable damage to public-private partnerships.  The effective execution of a government contract depends upon candor and teamwork between public and private employees.  To penalize [a government contractor's] actions here would render unlawful unpleasant but necessary communications between government employees and contractors.").

Put simply, DI was justified in telling the U.S. Army what happened on September 23, 2014 at Camp Bondsteel Gate 1 so the U.S. Army could decide whether its security protocols were breached and whether that breach should lead to the offender being placed on its bar access list.  Much like with the absolute privilege for defamation, DI's required and truthful communications with the government was privileged.  *See id.* ("Artfully pled business tort actions can threaten valuable speech just as much as defamation claims can.  Authority and common sense dictate that if a letter is privileged against suit for defamation, it must also be protected in an action for interference with business.") (internal quotation marks and alterations omitted); *Mission1st Grp.*,

2010 WL 4974549, at *2 ("Because the Report was made pursuant to a governmentally imposed duty, M1's submission was absolutely privileged in a defamation claim. For the same reasons, Filak's claim that Ml maliciously interfered with his prospective economic advantage ('Counterclaim IV') is dismissed to the extent it is based on the Report."); *see also Barr v. Matteo*, 360 U.S. 564, 569 (1959) (plurality opinion) (acknowledging the "law of privilege as a defense ... to civil damage suits for defamation and kindred torts").

Accordingly, the Court should grant summary judgment in DI's favor as to Liverett's tortious interference claim for this reason too.

## CONCLUSION

There are no genuine issues of material fact as to Liverett's defamation and tortious interference claims. Accordingly, the Court should grant DI's motion for summary judgment and enter judgment in its favor.

Respectfully submitted this 9th day of March, 2018

/s/ Robert P. Floyd, III
Robert P. Floyd, III (VSB No. 42264)
Stephen Stecker (Pro Hac Vice)
Constangy, Brooks, Smith & Prophete LLP
12500 Fair Lakes Circle, Suite 300
Fairfax, VA 22033
Phone: 571.522.6100
Fax: 571.522.6101
Email: rfloyd@constangy.com
Email: sstecker@constangy.com

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2018, a true and correct copy of the foregoing

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

was filed on ECF, which will send notice of the filing to Plaintiff's counsel:

>John C. Cook
>Philip C. Krone
>Cook Craig & Francuzenko PLLC
>3050 Chain Bridge Road, Suite 200
>Fairfax, Virginia 22030

>_/s/ Robert P. Floyd, III_____
>Robert P. Floyd, III (VSB No. 42264)
>Stephen Stecker (Pro Hac Vice)
>Constangy, Brooks, Smith & Prophete LLP
>12500 Fair Lakes Circle, Suite 300
>Fairfax, VA 22033
>Phone: 571.522.6100
>Fax: 571.522.6101
>Email: rfloyd@constangy.com
>Email: sstecker@constangy.com

>**ATTORNEYS FOR DEFENDANT**

25